# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JAMES T. ALFIERI, | § | |
| | § | |
|    *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. SA-08-CV-277-XR |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
|    *Defendant*. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff brings this suit pursuant to the Federal Tort Claims Act. Plaintiff alleges that he was an invitee on the Fort Sam Houston Golf Club (FSHGC) premises. The Morale, Welfare and Recreation Agency at Fort Sam Houston operates the premises. Plaintiff alleges that he was injured when his golf cart steering wheel began to shake violently, lost control, and then flipped on top of him. In his First Amended Complaint he alleges FSHGC employees: (1) failed to properly design the golf cart path; (2) failed to properly maintain the golf cart path; (3) failed to hire sufficient personnel to maintain the golf carts; (4) failed to properly maintain the golf carts; and (5) failed to post warning signs on the cart path to warn of potential dangers.

The Court conducted a bench trial from January 19 through January 22, 2010. Pursuant to Fed. R. Civ. P. 52, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

    A.    Jurisdiction, Venue and Parties

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1346. Venue is proper in this district and division. 28 U.S.C. § 1391.

2. Plaintiff timely presented his written claim to the proper federal officials, and this suit was filed within six months of the agency's final written notice of denial. 28 U.S.C. §§ 2401, 2675.

3. Plaintiff, James T. Alfieri, is an individual residing in San Antonio, Texas. At the time of the accident Plaintiff was employed as a salesperson at Office Depot, who was responsible for sales accounts with the federal government. He was born on February 9, 1950. He was previously employed as a teacher who on occasion assisted or supervised students playing on

the high school golf team. Prior to this accident, Plaintiff was an amateur athlete and avid golfer and played approximately 30 rounds of golf per year.

    B.    Background to accident

1. There are two golf courses at the Fort Sam Houston Golf Club: Salado Del Rio and La Loma. The Salado Del Rio course opened over 22 years ago. On average 40,000 rounds of golf are played on the course every year.

2. About 3:30 p.m., on June 4, 2004, Plaintiff James T. Alfieri began playing on the Salado Del Rio course. This was the first time Plaintiff played this course. The day was clear and sunny. Plaintiff was provided cart no. 90 for his use. (Pl. Ex. 25.1 - 25.5). He played with three other players.

3. Plaintiff testified that when he was first given the golf cart "there might have been a little play in the wheel" but that since he thought the course was relatively flat he thought "negotiating the course wouldn't be a problem with that cart." He further testified that on the first three holes, other than "maybe just a little play in the wheel" he did not have any trouble operating the golf cart. Plaintiff testified that he knew that if there were problems with the cart, he could return the cart and obtain a replacement.

4. After teeing off from holes nos. 1 and 2, a golf cart is required to traverse down steep cart paths. Tee box nos. 1 and 2 are elevated.

5. At the tee box of hole no. 3, Plaintiff opened a beer, began consuming it, but only had about a quarter of the can before the accident at hole no. 4.

    C.    Accident Scene

1. Plaintiff and the other three players teed off from the tee box at hole 4, they got into their three carts and began heading down the cart path. Plaintiff was alone in his cart. The tee off at hole 4 is elevated and the cart path is a long, asphalt path that descends steeply to the fairway with a couple of sharp curves present. Plaintiff's golf cart was the last to leave the tee box. The other two carts in the group were driving ahead of the Plaintiff's cart.

2. The cart driven by Brian Sheesley encountered no problems going down the cart path. Brian Sheesley did not note any problems with Plaintiff's cart prior to the accident. The Plaintiff never relayed to Mr. Sheesley that his cart was having any problems prior to the accident. Mr. Martin Maroney was a passenger in Mr. Sheesley's golf cart.

3. Plaintiff testified that after he left the tee box and approached the declining cart path he was riding the brake and going "very, very slow." He described the movement as "crawling." He testified that when he made the turn and began the descent he was probably not even using

the accelerator.

4. Mr. Maroney testified that the cart path was very steep, the cart he was in was going fast down the cart path, and that he heard Plaintiff's golf cart tire screeching and then he heard a crash sound.

5. About one-third down the cart path, Plaintiff's steering wheel unexpectedly began to violently shake, and the Plaintiff was unable to control the golf cart. Thereafter, the cart began to skid or slide and headed into a drainage ditch. The cart overturned and landed on top of Plaintiff.

6. The cart path did not have any warning signs indicating that the path was either steep or had sharp curves present. The cart path did not have any debris or obstacles present at the scene of the accident site.

7. When Plaintiff's golf cart rolled over, Plaintiff was trapped underneath the cart. Plaintiff's left leg was injured with the knee twisted at a 90 degree angle. He also suffered abrasions to his right leg. Plaintiff was in pain and screaming. Plaintiff's golf partners lifted the cart off the Plaintiff. Emergency medical personnel were summoned. Plaintiff was given morphine for pain and transported by ambulance to Brooke Army Medical Center (BAMC).

D. Plaintiff's injuries

1. When the cart tipped over, Plaintiff was pinned underneath the cart and his left knee was dislocated. In dislocating his left knee, Plaintiff also had related soft-tissue injuries, to include surrounding muscles and related soft tissues. His injuries included the rupture of the medial collateral ligament (MCL), the posterior cruciate ligament (PCL), and the anterior cruciate ligament (ACL).

2. Plaintiff presented to the BAMC emergency room with a "gross deformity of the left knee with tibia anterolaterally dislocated from femur and medial condyle exposed through 2cm x 2cm wound over medial knee...."[1] In the emergency room, the orthopedic residents pulled his leg bones together. This caused Plaintiff a great deal of pain. Initial concerns were expressed as to whether Plaintiff's leg may have to be removed, however, he was taken to the operating room where debridement and irrigation of his open knee dislocation took place, and there were no longer any concerns about removal of the leg. Plaintiff was placed under anesthesia, the ligaments were assessed, and thereafter the exposed cartilage was cleaned and closed. Dr. Ficke opined that the Plaintiff would need multi-ligament reconstruction in the future. Plaintiff was discharged from BAMC about five days after his admission.

---

[1]Dr. James Ficke testified that Plaintiff had a left knee dislocation, and he had a laceration or a break in his skin over the medial side of the inside portion of his knee that was connected with the knee joint, and the knee dislocation where he had torn multiple ligaments in his knee.

3

2.  Prior to the accident, Plaintiff was described as an active, athletic person who coached baseball, football and basketball. He also supervised students who played golf. For at least two to three months after the accident Plaintiff required assistance to walk, drive and perform day-to-day tasks. Plaintiff has been able to resume golf but not with the same frequency. On a couple of occasions, Plaintiff has been required to leave the golf course early because of pain to his leg. He is, however, no longer able to throw baseballs with his two sons (coaches and former college baseball players). Plaintiff lost weight and muscle strength. His mood became dull, short and "snappy" or "upset". Plaintiff had difficulty sleeping for some period of time. On a couple of occasions he suffered some anxiety or panic attacks yelling "get this off me." For a few months Plaintiff required the assistance of his adult son to cook, change his dressing and otherwise provide care.

3.  Due to the injury Plaintiff was unable to work from June 4 through October 1, 2004.

4.  On June 5, the Plaintiff was evaluated for physical therapy. The Plaintiff was apprehensive about his mobility and control with crutches. The Plaintiff complained of pain to his knee when it was dependent during transfers and gait training. The medical doctor ordered passive range of motion exercises in bed with his leg brace on and unlocked. (Pl.'s Ex. 44.4.) He was provided additional therapy on June 7. He was provided with crutches and a wheelchair was recommended. He was thereafter discharged from BAMC.

5.  On July 28, Plaintiff began an out patient physical therapy program. He was referred to physical therapy by David R. Schmidt, M.D. He was provided with an exercise regimen, education and training and an independent home program. He attended 17 sessions of physical therapy. The last record, dated September 28, 2004, indicates that the Plaintiff was "sleeping better, walking in pool everyday, 90% of goals met." At the conclusion of his treatment he was full weight bearing, *i.e.*, he was able to walk without any assistive device with minimal to no limping. (Govt. Ex. 24).

6.  On occasion Plaintiff wears his leg brace because of continued pain. On occasions his sleep is disturbed because of leg pain. He has recently been diagnosed with osteoarthritis. He sometime has difficulty walking. While he was undergoing therapy, Plaintiff suffered from anxiety attacks.

7.  From June 24, 2004 through December 2009, Plaintiff saw either David R. Schmidt, M.D. or Paul Saenz, D.O. on 19 occasions. Plaintiff has been receiving medical treatments, examinations and rehabilitation therapy from Sports Medicine Associates of San Antonio due to the joint and ligament injuries he suffered. Dr. Paul Saenz testified that Plaintiff is also suffering from chronic osteoarthritic changes to the left knee, the left knee medial has degenerated, and that this condition was caused by this golfing accident. Dr. Saenz opined that Plaintiff may require either full or partial knee replacement at some point in the future.

E. Golf Cart Maintenance and Cart No, 90

1. From September 1992 to 1998, Mr. Patricio Sanchez was employed at the Sonterra Country Club. He received on-the-job training there and was employed as an assistant golf cart mechanic. He became employed at the Fort Sam Houston course in 1998. He is the sole golf cart mechanic and is responsible for maintaining 175 carts.

2. Mr. Sanchez (and other employees) are responsible for "stationing" the golf carts. He drives the carts from the "barn" to the staging area each morning for use by the players. During that drive (approximately 30 - 100 feet), he checks the golf carts to insure that the steering mechanism, accelerator and brakes work correctly. Carts are also checked for proper functioning when they are driven to an area where they are washed and later returned to the barn.

3. After course officials were notified of Plaintiff's injury, the cart that was used by Plaintiff was driven back to the "barn" by employee Robert Thomas. Mr. Thomas testified that he had no problems with the cart as he drove it back to the "barn." During that drive back to the barn, Mr. Thomas went downhill at a slope half as steep as the cart path on hole no. 4. He testified that the cart had no problems going down hill.

4. On June 5, Mr. Thomas notified Mr. Sanchez that an incident occurred the day before, that he had driven the cart back to the barn with no problems, and that management was requesting that Mr. Sanchez inspect the cart for problems. Mr. Sanchez drove the cart on an incline and decline, checked the brakes, and noted no problems with the steering or brakes on cart no. 90. The cart was returned to service. The cart was used on a periodic basis until sometime in August. The cart was then taken out of service because the golf course was notified of a potential lawsuit and a litigation hold was put in place.

5. The cart was purchased from E-Z GO in 2001. E-Z GO's Service Parts Manual (Pl.'s Ex. 29.1) recommends that warning signs be used "to warn of situations that could result in an unsafe condition." (*Id.* at M5.) The manufacturer also recommends that complete maintenance records be maintained. (*Id.* at M11.) The manufacturer also recommends that management should periodically inspect the maintenance logs. (*Id.* at M26.) A periodic service schedule is recommended. (*Id.* at M20.) If carts are to be used in an area with a steep grade, the manufacturer recommends that a warning be posted in such a location. (*Id.* at M24.) The Service Parts Manual also cautions that "satisfactory brake performance does not eliminate the need for routine brake testing and inspection.... Continued proper brake operation depends on periodic maintenance." (*Id.* at M154.)

6. Maintenance records for each cart were not maintained by the Defendant. Management officials never requested any maintenance logs. Mr. Sanchez testified that he has not conducted the periodic brake performance tests recommended by the manufacturer. (*See id.* at M156-157.) Mr. Sanchez testified that he is not able to complete the manufacturer's

5

periodic maintenance record inasmuch as he is the only golf cart mechanic. (Pl.'s Ex. 37.2, M386.) When carts are identified as malfunctioning, one of the golf cart barn employees will generally leave a note on the cart for Mr. Sanchez. Mr. Sanchez keeps notes of repairs that he makes.

7. A video was taken of the inspection of cart no. 90 on August 23, 2005. The video demonstrates that the steering wheel was "loose" at that time, i.e., the steering wheel can be turned between 33° and 40° without any movement in the front tires. Mr. Sanchez testified during the trial that on August 23, 2005, the cart was not safe in that condition.

8. Every 30 to 45 days, an E-Z GO employee would come to the Fort Sam Houston golf course and perform random inspections of the golf carts. Sometime after August 2005, Mr. Sanchez requested the E-Z GO employee inspect cart no. 90. No problems were noted.

9. Cart no. 90 had a warning label on the dash board advising individuals to "drive slowly straight up and down slopes and in turns."

   F.   Expert Witnesses

1. Jerry G. Wallingford is a registered professional engineer. He is an expert in the field of forensic engineering. He was retained by the Plaintiff to inspect the cart path on hole no. 4. He testified that the cart path was approximately 10 feet wide. The path well exceeded 200 feet. In the 204 foot section that Mr. Wallingford examined, that section had an average grade of 15.3%. After a player leaves tee box no. 4, a player makes a left turn and travels a short distance. The path then descends at a slope of 18% for approximately 23 feet. Thereafter, the path descends at a slope of 20.6% for 52.7 feet. Thereafter, for approximately 130 feet there is a slope of 12%. Because Mr. Wallingford was retained in 2009 and a resurfacing of the path occurred at some prior point in time, Mr. Wallingford was unable to express an opinion as to the quality of the cart path at the time of the accident. He expressed no opinions regarding any problems with brakes in cart no. 90. He concedes that he did not do any testing of cart no. 90's steering mechanism (other than to note that in August 2005, there was loose play in the wheel). Mr. Wallingford did opine that the bushings and shaft in the cart's steering mechanism required lubrication on a periodic basis and failure to properly lubricate that area could effect the "looseness" of the steering wheel. He conceded that the sharp right curve at the bottom of the path played no role in the accident at issue. He stated that the cart path had no sign warning of the steep grade. He opines that if Plaintiff completed the initial left turn and encountered the initial 18% slope at an accelerating speed, these factors along with the unacceptable play in the steering wheel caused this accident. He acknowledged that the Plaintiff's testimony that Plaintiff turned the corner slowly, was "riding the brake" and never took his foot off the brake differed from his "accelerating speed" theory. Mr. Wallingford also suggested that there may have been loose aggregate in the cart path, but conceded that he could not testify to that fact with a degree of engineering certainty.

6

2.  Jose H. "Joe" Martinez owns and operates a golf cart sales and service company. He testified that he services 169 carts for La Cantera Golf Course and 72 carts for the Dominion Golf Course. La Cantera replaces their carts every year and require little maintenance. He is the brother-in-law of Patricio Sanchez. He testified that he taught Mr. Sanchez how to maintain and service golf carts. He testified that although he thought the brakes were weak when he drove the cart in August 2005, he offered no opinion as to whether the brakes contributed to this accident. Mr. Martinez did opine that the steering wheel had too much play in August 2005, and was accordingly unsafe at that time. Mr. Martinez, however, conducted no other examination of cart no. 90.

3.  John Eftekhar, Ph.D. testified for the Government. Dr. Eftekhar opined that this accident was caused by the Plaintiff's inattention. "He was not paying attention and he veered to the left. By the time he realized he was going into the gutter, he made a right hand turn, a severe right hand turn, which is evidenced by the marking in the gutter, and as he is coming out of the gutter, this particular unit rolled over, it tipped over and then slid to its final position." Dr. Eftekhar testified that "as you leave the tee box, even before you get to the first left turn, you can see the -- this turn and the downhill grade." Accordingly, he opines that the lack of a warning sign, the first curve and the downhill grade were not contributing factors to the accident. He further testified that there was no "sudden acceleration" of the cart given the Plaintiff's own testimony. He testified that the cart path was sufficiently wide providing three and one-half feet of space on both sides of a traveling cart. Dr. Eftekhar testified that the golf cart rolled over when the golf cart wheels were driven into the gutter and came out.

F.  Court's "Ultimate Findings"

1.  The opinions of Jerry Wallingford and Jose Martinez that the steering wheel's looseness caused the Plaintiff to be unable to adequately control the direction of his cart on the steep path cannot be accepted. Plaintiff offered no testimony at trial to prove that the steering wheel on the date of the accident had anything other than the customary 8° to 10° play in the wheel. On the day in question, Plaintiff voiced no complaints about the cart, and drove down two steep cart paths at hole nos. 1 and 2. The cart was later driven back to the barn without difficulty. The cart was later inspected by Mr. Sanchez and no problems were noted. The cart was later placed back into service. The fact that fourteen months later the cart had a 36° to 40° play in the wheel could have been caused by subsequent lack of maintenance when the cart was taken out of service due to the litigation hold. Neither of the Plaintiff's experts offered any evidence or opinion that cart no. 90 was not properly maintained and lubricated prior to the accident. They offered no evidence or opinion regarding the brakes properly working that day or whether they were properly serviced prior to the accident.

2.  The Court rejects Plaintiff's argument that he did not return the cart because excessive looseness in the wheel could not be detected given that he was driving in open terrain (rather than in a "closed" cart path such as that existing at hole no. 4). Plaintiff drove through at

7

least three areas where the cart path was similar to hole no. 4 (holes nos. 1 and 2 and over a bridge at hole no. 3).

3. The Court rejects Plaintiff's argument that cart no. 90 had a 36° to 40° play in the steering wheel at the time of the accident. Had the cart possessed such a degree of play in the wheel Plaintiff would have had difficulties navigating the cart paths at hole nos. 1 and 2 and the bridge at hole no. 3.

4. Mr. Sanchez is overworked. He is unable to maintain the number of carts and attend to insuring that maintenance logs are kept. He is conscientious, however, and no evidence was offered that cart no. 90 was not properly serviced prior to the date of this accident.

5. The cart paths at hole nos. 1, 2 and 4 are steep and no warning signs are posted to notify players of the conditions they will face going downhill. However, Plaintiff concedes that he is unable to establish a viable claim for a violation of premises liability. (Pl.'s 3d Am. Mem. of Law, Proposed Findings of Fact & Conclusions of Law at 15, Jan. 21, 2010 [Docket Entry No. 69].)

    G. Any findings of fact which should more appropriately be deemed conclusions of law are so deemed.

## CONCLUSIONS OF LAW

1. The Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 *et seq.*, abrogates the United States' sovereign immunity for compensatory damages arising out of claims for injury or loss of property "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir. 1995) (en banc).

2. The FTCA permits "civil actions for damages against the United States for personal injury or death caused by the negligence of a government employee under circumstances in which a private person would be liable." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). In FTCA cases, the federal courts rely on the substantive law of the state where the alleged wrongful acts occurred. *See* 28 U.S.C. § 1346(b)(1); *Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir. 1995) (en banc). Here, because the alleged negligence occurred in San Antonio, Texas, Texas law applies.

3. In Texas, the elements of negligence "are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008); *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794,

798 (Tex. 2004). "The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability." *Id.* "Foreseeability means the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act created for others." *Boggs v. Bottomless Pit Cooking Team*, 25 S.W.3d 818, 823 (Tex. App.—Houston [14th Dist.] 2000, no pet.). "Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Villafranca v. U.S.*, 587 F.3d 257 (5th Cir. 2009).

4. "The question of legal duty is a multifaceted issue requiring [the court] to balance a number of factors such as the risk and foreseeability of injury, the social utility of the actor's conduct, the consequences of imposing the burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case." *Tex. Home Mgt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex. 2002) (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983)).

5. "[A] company's internal policies 'alone do not determine the governing standard of care.'" *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92 (Tex. 2004) (quoting *Fenley v. Hospice in the Pines*, 4 S.W.3d 476, 481 (Tex. App.—Beaumont 1999, pet. denied)).

6. "Negligent conduct is a cause of harm to another if, in a natural and continuous sequence, it produces an event, and without the negligent conduct such event would not have occurred." *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991).

7. "A person or company is not responsible for a consequence which is merely possible, according to occasional experience, but a person or company is responsible for a consequence which is probable, according to ordinary and usual experience. To impose responsibility for negligence, it must have been foreseeable that this event or some similar event would result as a natural and probable consequence." *Baylor Med. Plaza Servs. Corp. v. Kidd*, 834 S.W.2d 69, 75 (Tex. App.—Texarkana 1992, writ denied). "Before imposing a duty of care, however, the risk of harm must be foreseeable." *Tex. Home Mgt., Inc. v. Peavy*, 89 S.W.3d 30, 36 (Tex. 2002).

8. Plaintiff has failed to establish by a preponderance of the evidence that cart no. 90 was defective on the date of the accident. The evidence demonstrated that the brakes and steering mechanism were within acceptable ranges of operation.

9. Plaintiff has failed to prove by a preponderance of the evidence that Defendant breached any duty owed to Plaintiff.

10. Plaintiff has failed to prove by a preponderance of the evidence that Plaintiff's damages were proximately caused by Defendant's breach of any duty owed to Plaintiff.

11. Plaintiff's inattention or negligence caused the accident in question.

9

12. Defendant was not negligent. Defendant provided Plaintiff with a reasonably safe cart on the day in question. Plaintiff failed to prove by a preponderance of the evidence that Defendant failed to maintain and properly adjust the cart prior to the accident. Although Mr. Sanchez is overworked, Plaintiff failed to prove by a preponderance of the evidence that Defendant's failure to hire enough staff resulted in cart no. 90 being unsafe on the day of the accident. Plaintiff failed to prove by a preponderance of the evidence that Mr. Sanchez was inadequately trained. Plaintiff failed to prove by a preponderance of the evidence that cart no. 90 had defective brakes or a defective steering mechanism on the day of the accident.

## CONCLUSION

In accordance with these findings of fact and conclusions of law, the Clerk is instructed to enter a judgment that Plaintiff take nothing on his claims.

It is so ORDERED.

SIGNED this 27th day of January, 2010.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE